IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RITA FLORIAN PINGREE,<br><br>      Plaintiff,<br><br>v.<br><br>UNIVERSITY OF UTAH and CAROLINE MILNE,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00724-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiff Dr. Rita Florian Pingree, a graduate of the University of Utah medical school, repeatedly tried to match into the internal-medicine residency program (and a couple other residency programs) at the University to eventually become licensed to practice medicine, each time unsuccessfully. According to the University, her applications were not competitive enough to match there. Unfortunately for Dr. Pingree, she was also going through a bitter divorce during medical school, a divorce made exponentially more complicated by disagreements over custody of her young daughter. Finalizing the divorce and complying with the court's decree severely limited her options for residency outside of Utah. After years of trying to complete her medical training here in the States, she gave up and returned to Europe, where she is from. Understandably frustrated by her long, often painful years trying to get a residency at the University, she now sues the University (and one of its employees, Dr. Caroline Milne, who was closely involved in reviewing Dr. Pingree's applications) under various common-law, constitutional, and statutory

theories for damages.[1] The parties have been in litigation for several years, and before the court now is Defendants' motion for summary judgment on all of Dr. Pingree's claims and Dr. Pingree's motion for partial summary judgment on her claims of gender discrimination.

The record evidence would not support a jury verdict in Dr. Pingree's favor on her contract claims, so the court GRANTS Defendants' motion for summary judgment as to these claims. But a reasonable jury could find for either Dr. Pingree or the University on her claims of promissory estoppel, discrimination, and retaliation, so the court DENIES Defendants' motion for summary judgment as to these claims and DENIES Dr. Pingree's cross-motion for partial summary judgment.

## BACKGROUND

Becoming a licensed medical practitioner is no small task. Not only does it require successfully completing medical school, but it usually also requires completing a residency program in the intended specialty. Candidates apply to and programs select candidates through the National Resident Matching Program, or Match for short. (The Match is used for all residency programs except those in ophthalmology, a specialty not relevant to this case.) Each candidate submits a ranked list of his preferred programs, and each residency program submits a ranked list of candidates who have applied to it. The Match algorithm aims to maximize outcomes for both groups and reveals the final rankings each year in March for residency programs set to start in the fall. Candidates are required to join the program to which they are matched.

---

[1] Originally, Dr. Pingree also named Dr. Wayne Samuelson, another University employee, as a defendant. However, this court dismissed the claims against him following Defendants' motion to dismiss. ECF No. 37; *Pingree v. Univ. of Utah*, No. 2:20-cv-00724, 2022 WL 1307902 (D. Utah May 2, 2022).

Not all candidates place into a residency program through the Match, and likewise, not all programs fill their spots. Hiring outside the Match looks more like traditional hiring—submitting individual applications, interviewing, sending reference letters as requested, and finally accepting or rejecting offers.

Through the Match, a candidate can apply to either preliminary internships or categorical programs. The distinction between these two types is crucial for resolving the parties' motions for summary judgment here, particularly regarding Dr. Pingree's contract claims. Categorical residents are hired with the expectation that they will continue in the program for the duration of the program, which varies depending on the specialty. For example, a residency in internal medicine lasts three years, so a resident hired into an internal-medicine categorical program is expected to stay on for the full three years, although technically he is employed one year at a time. A preliminary intern, by contrast, is hired for one year with the expectation that he will complete that year and then go on to a categorical residency in a different specialty. So, for instance, an intern hired into an internal-medicine preliminary program will finish his one year in internal medicine and then go on to a categorical residency in, say, dermatology, which usually requires an initial preliminary year. Although the preliminary-intern year overlaps significantly with the first year of the categorical residency, at least in internal medicine, rarely if ever is a preliminary intern moved into the categorical program after a preliminary year in the same specialty. (To make matters more confusing, the first year of the categorical residency is often called the intern year.) That means that a candidate wishing to pursue an internal-medicine categorical residency would almost never accept a preliminary internship in internal medicine. The first year of residency is typically referred to as PGY-1 for post-grad year 1 (whether categorical or preliminary), the second year as PGY-2, and so on.

3

Dr. Rita Florian Pingree graduated from the University of Utah medical school in 2012 after finishing undergrad in 2008, also at the University of Utah. From what it appears, sometime during her undergrad years, she met a man named Dr. Jim Pingree (referred to simply as Jim in this opinion) who was finishing or had already finished his residency in neurosurgery at the University. The two married and had a daughter in 2008. The marriage did not last, however, and Dr. Pingree was caught in a contentious divorce by the time she finished medical school and began applying for residency programs. The divorce court decree required that Dr. Pingree keep her daughter in Utah, and since Dr. Pingree wanted to remain involved in her daughter's life, she decided she would try to stay in state for residency.

Utah, it turns out, has limited options for residency, with most in-state programs offered through the University. Dr. Pingree first enrolled in the Match during the fall of 2011 to try to secure a residency for the 2012–13 academic year. She ranked the University's internal-medicine program on her list, and as a University medical student (that is, an internal applicant), she automatically got an interview with the internal-medicine program director, Dr. Caroline Milne.

Dr. Pingree and Dr. Milne offer different accounts of how the interview unfolded. Although their disagreement about the interview is not directly relevant to the legal issues, it provides helpful background context for their later disagreements forming the basis of Dr. Pingree's legal claims. According to Dr. Pingree, Dr. Milne brought up the topic of Jim, thinking it would help spark a connection, not realizing that Dr. Pingree and Jim were in the middle of divorce proceedings. Dr. Milne mentioned that Jim seemed like he was a great dad, taking his daughter to the fair, which forced Dr. Pingree to bring up the topic of her ongoing divorce. Dr. Pingree, though, was not prepared to talk about her divorce, and she quickly broke down. (As it happened, Dr. Milne had worked with Jim when she was a resident and he was a medical student. They had collaborated on

4

a cardiology rotation, and she had a positive impression of him. Sometime before the interview, she had run into him at the fair.)

According to Dr. Milne, the topic of the divorce had already come up in Dr. Pingree's application materials, specifically the dean's letter. What concerned Dr. Milne was that Dr. Pingree, as she saw it, got overly emotional talking about her divorce. This raised a red flag for Dr. Milne because internal medicine is an emotionally demanding specialty, requiring an ability to keep calm even in emotionally tense situations. Moreover, at least according to Dr. Milne, Dr. Pingree had a spotty medical-school record, and she had done nothing in particular to indicate that she was interested in pursuing internal medicine.

After the interview but before the Match reveal, the dean of the medical school notified Dr. Pingree that she was not ranked highly enough on the internal-medicine program's list to be accepted there. He suggested that she consider other options and withdraw from the Match because it would look better for her later to have withdrawn from the Match than for her to have failed to match. She followed that advice and applied to other programs after the Match process was finished, and received offers from Duke for a preliminary internship and Case Western for radiology. However, she ended up withdrawing from those programs after the divorce court refused to alter its order to keep her daughter in state while the divorce was pending. A similar sequence occurred the following year—she applied for various programs but pulled out because the divorce was still not finalized.

Over the next few years, Dr. Pingree continued to apply to various residency programs at the University to no avail. Along the way, though, she successfully finished a master's in bioengineering from the University and completed a surgical preliminary internship and a cardiac-imaging fellowship—a program jointly administered by the cardiology and radiology

5

departments.[2] Now fast forward to the 2017 Match (the cycle for residency programs starting fall 2017), through which Dr. Pingree applied to the University for a radiology residency and an internal-medicine residency, both categorical positions.[3] (She also applied for categorical positions at other institutions, including the University of Nevada and the University of Arizona.)

She did not match with either residency at the University. According to Dr. Marta Heilbrun, the program director of diagnostic radiology, Dr. Pingree's application for radiology was spotty. On the one hand, she had received glowing reviews from the supervisor of her cardiac-imaging fellowship, and insofar as others had flagged issues with her performance as a medical student (issues that appear to have been linked to her difficult divorce situation), Dr. Pingree provided a convincing explanation for why those issues would not persist into her residency year. On the other hand, she had not engaged in projects with the radiology department, she did not have a letter of support from anyone in radiology, and faculty in radiology did not have a sense of who she was because she had not built relationships with them despite having completed a fellowship that was jointly administered by the radiology department. These factors undermined her stated interest in pursuing radiology.

As for internal medicine, the reviewing committee, which included Dr. Milne, was troubled by Dr. Pingree's lackluster standardized test scores, including a failed first attempt at Step 3, one

---

[2] A true fellowship takes place after residency and provides an opportunity for even more specialized training. Dr. Pingree, of course, had not yet completed residency, so technically her cardiac-imaging job was not a fellowship. But since the parties refer to that position as a fellowship, the court follows suit.

[3] Dr. Pingree had also applied for a categorical position in radiology at the University in the 2016 Match. She was not selected for it. But as the parties agree (or at least appear to agree), her 2016 non-placement falls outside the statute of limitations, and she cannot challenge that decision as a discriminatory act in this litigation.

of the required board exams. Dr. Pingree was also ranked in the bottom 5% on her internal-medicine, pediatric, and surgical rotations while she was in medical school. And she had not submitted the required letter from the chair of the internal-medicine department. Although her supervisors had left some very positive comments for her, such as noting that she was keenly attuned to her patients' psychosocial aspects, these comments apparently carried little weight with the reviewers because it is standard for supervisors to leave positive comments across the board.

In February 2017, before the Match reveal, Dr. Milne met with Dr. Pingree to discuss her application for the internal-medicine categorical residency. Dr. Milne explained that although she and other faculty members who previously questioned Dr. Pingree's reliability and performance "believe[d] in [her] now," the reviewing committee had ranked her "way below on [their] categorical match." ECF No. 107-1, at 2. So, she encouraged Dr. Pingree to consider switching her Match ranking from the internal-medicine categorical program to the internal-medicine preliminary program. Dr. Milne assured Dr. Pingree that she would match for the preliminary program and said, "[I]f everything goes well next year, we would just, at this point in the year, end of January, offer you a PGY 2 spot in the categorical position." *Id.* at 3. Then she said added, "[I]f you do well next year, I guarantee you can stay in this program." *Id.* Dr. Pingree took her advice, switched her ranking preference, and matched into the University's internal-medicine preliminary program.

The parties offer very different accounts of the first few months of Dr. Pingree's preliminary internship. According to Dr. Pingree, it was smooth sailing. She received positive evaluation scores, and she was performing at or above the national average in the 15 core competencies on which residents are evaluated. But according to Defendants, her performance was mixed, garnering both positive and negative reviews. According to some supervisors, she generally

7

performed at the level expected of a PGY-1, but her performance did not show the sustained improvement over the year that is necessary to be prepared for a PGY-2 position. Others noted that she could be at times unprofessional.

Based on the first few months of Dr. Pingree's preliminary year, the Clinical Competency Committee, made up of Dr. Milne and other faculty members, made the decision not to offer her a PGY-2 position for the 2018–19 academic year. Dr. Milne communicated this decision to Dr. Pingree orally in March 2018. Dr. Milne explained, "I was like . . . if she can do the work, we'll let her do the work. . . . But there were lapses and there were also really late discharge summaries . . . ." ECF No. 107-3, at 2. She continued, "[N]obody else is doing that. So your last eval . . . was pretty bad. In fact, [the attending hospitalist] had to do some of your discharge summaries he said." *Id.* at 2–3. "[So,] I don't have a spot for you . . . ." *Id.* at 3.

Dr. Pingree, naturally, disagreed with Dr. Milne's assessment of her performance. As she put it, "I actually don't think I did as bad as people are saying." *Id.* at 3. She attributed the negative evaluations to "a stigma on [her] head" stemming from her bitter divorce, which had become known throughout the school, and said she was "not surprised at all" to hear the negative comments. *Id.* She specifically disputed that the attending hospitalist ever had to do her discharge summaries for her, and she protested that insofar as she was falling short of the expectations, she was doing "[no]thing . . . that the other interns [we]re not doing." *Id.*

Their conversation continued, Dr. Milne trying to justify the University's actions and Dr. Pingree trying to justify hers. Dr. Pingree explained that as she experienced her years at the University, "[her supervisors] didn't care about [her] and they didn't intend to help [her]." *Id.* at 10. "Nobody . . . ever checked in with [her] if there were some problems." *Id.*

Dr. Milne responded, "I don't have any doubt whether or not you could do the work. It's the reliability, the dependability." *Id.* at 10–11. She continued, expressing her disbelief at how little Jim appeared to be helping Dr. Pingree: "[A]t some point in the middle of the year, I really did want to call your family and say, 'Where are you? Where is the support?' I mean, this is a man [Jim] that's making $2 million a year in the valley." *Id.* at 11. She then made a series of comments based on her own experience going through residency and becoming a licensed medical practitioner:

> I couldn't do it without a nanny. And I'm not on residents hours. . . . I can't get my kids to school, I can't get my kids up . . . . [S]o the thought that you were trying to do it as a resident is just so ludicrous.
>
> And I'm trying to understand your situation or your thinking. And you know, when you say you have no confidence, you know, maybe at some point you felt like [you] couldn't ask him for help.

*Id.* at 11–12.

Dr. Milne then probed further about Dr. Pingree's situation to understand what she thought she would be able to do differently if she were offered a PGY-2 position for the following year, making some gendered comments along the way:

> Well, I guess, I have to ask you a question . . . —what could be different if you continued in the program? I don't think your mom's reliable either. She must be older and she's got health problems. How can—what can we do to be different because, you know, this is the—this is the problem, people have to be reliable and dependable in the workplace. I have to too, even as a faculty member. . . .
>
> And you know, I don't want it to be a woman/male thing, it could be either, right? But it does fall to the woman.

*Id.* at 14. She elaborated, sharing about how her own husband "never interviewed a nanny," "never did any of those kind of things." *Id.* "[I]t wasn't—it just—it just fell—so I wish it weren't a man/woman thing but it is." *Id.* at 15. Before asking Dr. Pingree specifics about her custody

9

arrangement with Jim, Dr. Milne added, "I'm actually writing a paper about women having children in residency and 67 percent of women in procedural specialties after they have a child wish they had chosen a different specialty." *Id.* at 15–16.

After hearing some more from Dr. Pingree, Dr. Milne apologized at length for the way Dr. Pingree felt treated in the program and expressed her goal to make every resident feel like his supervisors are empathetic and caring, a goal that had not been met in Dr. Pingree's case. She asked Dr. Pingree to "give [her] 48 hours" to see if she could change the other Committee members' minds. *Id.* at 28.

According to Dr. Pingree, Dr. Milne never followed up. When Dr. Pingree went to speak with her the following month, Dr. Milne said that she was "trying to get funding" for Dr. Pingree to continue getting training after her preliminary year ended in June. ECF No. 127-33, at 7. When the two met again in June, Dr. Milne said the University could offer her another preliminary position for the following year so that she could maintain her insurance, continue to earn an income, and receive further training. A PGY-2 position, she said, was off the table because Dr. Pingree had not demonstrated that she was ready to accept the responsibilities of supervising first-year residents and working independently with patients. The two discussed whether it would make strategic sense for her to take it, and Dr. Pingree accepted shortly afterward.

A few months later, in October 2018, Dr. Pingree filed a discrimination complaint with the University alleging that Dr. Milne discriminated against her on the basis of sex (specifically, that Dr. Milne discriminated against her for being a single mother). For present purposes, the parties agree that Dr. Milne learned about the complaint on November 7. Based on the allegations and Dr. Milne's subsequent response, the University issued a final report in April 2019 finding insufficient evidence to support Dr. Pingree's claim of sex-based discrimination.

Also in the fall of 2018, Dr. Pingree applied for a PGY-2 position at Greenwich Hospital in Connecticut, thinking that if she got accepted there, she might be able to convince the divorce court to allow her to move her daughter to Connecticut, where she had some family. On November 14, Dr. Aaron Crosby, one of Dr. Pingree's advisers, emailed Dr. Charles Seelig, the program director at Greenwich, about the open PGY-2 position. Dr. Seelig said he would need all of Dr. Pingree's application materials, including a letter of recommendation, prior to their selection-committee meeting on November 20.

Later the same day (still November 14), Dr. Milne emailed Dr. Crosby to see whether he would feel comfortable writing the recommendation letter instead of her. That way, he could "field the calls," which Dr. Milne considered best because as she saw it Dr. Pingree "[wa]s concerned about [her] taking the calls." ECF No. 144-7, at 1. Dr. Crosby agreed to write the letter of recommendation and submitted Dr. Pingree's application materials to Dr. Seelig the next day (November 15).

A little over a month later, on December 20, Dr. Seelig emailed Dr. Crosby back to say that Greenwich was "seriously considering" Dr. Pingree for the PGY-2 position and that he would need a letter of recommendation from Dr. Milne because she was the program director. ECF No. 127-50, at 5. (A letter of recommendation from the program director is a standard requirement for applications to PGY-2 programs.) Multiple people—Dr. Crosby, Dr. Seelig, and an administrative associate director at the University named Amy Kern—contacted Dr. Milne about her letter of recommendation. Dr. Milne told Dr. Seelig that she could not speak with him until Dr. Pingree "request[ed] and approve[d] . . . discussing her performance." *Id.* at 4. And she told Dr. Crosby, "In light of everything, perhaps best I wait until [Dr. Pingree] requests this." *Id.* at 5.

Around this same time, possibly on December 20 itself (the record is not entirely clear), Dr. Pingree requested a leave of absence from her preliminary internship. On December 26, she reached out to Dr. Milne about the letter of recommendation. Dr. Milne responded, "I am supportive [of your seeking PGY-2 positions]. [But i]t's a tricky situation right now—not because of your complaint—but because you are on requested leave. I'm not sure how I should discuss that." ECF No. 127-51, at 5. Dr. Pingree wrote back the next day, "I fail to see how my current leave (which began just a few days ago) is the stumbling block in any conversation with the Greenwich Program Director, nor why it should even come up whatsoever in any conversation." *Id.* at 3.

On December 28, Dr. Milne emailed Dr. Seelig, copying the University's attorney, Scott Smith, to set up a phone call to discuss Dr. Pingree's application and said that she could send him the letter of recommendation that she had written for Dr. Pingree the previous year. Dr. Milne and Dr. Seelig spoke over the phone on December 31.

The following day (New Year's Day), Dr. Milne emailed Dr. Crosby about her conversation with Dr. Seelig, mentioning that Dr. Seelig "was very suspicious that [Dr. Pingree] didn't have a letter from [her]" and that she "sincere[ly] hope[d] that [Dr. Pingree would] obtain[] this position." ECF No. 127-50, at 9. On January 2, Ms. Kern emailed Dr. Seelig two letters of recommendation from Dr. Milne, one dated January 2019 and an earlier one dated May 2018, and on January 4, Dr. Seelig informed Dr. Pingree that she had not been selected for the PGY-2 position.

At some point after she learned that she was not accepted at Greenwich, Dr. Pingree filed a complaint with the University alleging that Dr. Milne had retaliated against her by harming her application to Greenwich. In particular, Dr. Pingree claimed that Dr. Milne included Mr. Smith on

12

her email to Dr. Seelig as a subtle tip-off to him and that she answered Dr. Seelig's questions

hesitantly rather than enthusiastically. Dr. Milne wrote to Mr. Smith and another University

employee with her perspective on the issue:

> I would have NO reason for Rita not to get the position at Greenwich Hospital. It
> would have been in my best interest for her to have received the position.
>
> The cc to Scott was totally a mistake. It was meant to be a BC but unfortunately I
> was doing this on my phone on vacation in South America because Rita failed to
> ask me for a letter in a timely manner. And the failure to provide my contact
> information and the letter is the reason she did not get the position. I was feeling
> very stressed about this whole thing because her lawyer (or Rita via her lawyer)
> had just cc'd all these legal people on an email (including you) saying
> basically . . . are you going to supply a letter or not? This after Dr. Seelig had asked
> for it 3 weeks earlier. I felt very threatened. I felt time was very important even
> though it was over the holidays and shouldn't have been . . . but the email from
> Rita's lawyer felt very threatening to me (as if I was the reason she wouldn't get
> this position). . . . Rita needs to take responsibility for her not getting the position
> at Greenwich and it specifically has to do with her delay in getting Dr. Seelig my
> contact information. This was a very big red flag to him, as it would be to ANY
> program director.

ECF No. 144-12, at 3.

Believing that she had no prospects for finishing her medical training in the United States,

Dr. Pingree took a position in Switzerland as a cardiology fellow in 2020, and it appears that she

is still in Switzerland. At all times during her employment with the University, Dr. Pingree was

protected by various University policies prohibiting discrimination on the basis of sex and

guaranteeing certain procedures for adverse employment decisions. (Note: residents are treated as

both students and employees and so receive protections under both sets of policies.)

**ANALYSIS**

The court must grant summary judgment on a claim or part of a claim when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a). In applying this standard, the court must always view the facts "in the light

most favorable to the non-moving party[,] draw[ing] all reasonable inferences in [its] favor." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). When the parties have filed cross-motions for summary judgment, the court "must view each motion separately, in the light most favorable to the non-moving party." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016) (internal quotation marks omitted).

Initially, "[t]he movant has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant does not bear the burden of persuasion at trial, it may satisfy its burden "simply by pointing out . . . a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Then, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* If instead the movant bears the burden of persuasion at trial, "[its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis removed) (internal quotation marks omitted). The nonmovant must then show that "the evidence is susceptible of different interpretations or inferences by the trier of fact." *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). Several of Dr. Pingree's claims overlap, but for simplicity and ease of understanding, the court considers each claim separately.

## I.    Count 1 (breach of contract, against the University)

Dr. Pingree's first claim is for breach of contract against the University. In particular, she claims that the University violated the following policies, which she contends were incorporated into her employment agreement: Graduate Medical Education ("GME") Policy 12.1 (on academic action, resident grievance, and appeal procedures), GME Policy 11.4 (on final evaluations), GME

Policy 11.5 (on program policies), and the University's Nondiscrimination Policy 1-012. A few
details about each of these policies are necessary to understand the dispute.

GME Policy 12.1 outlines the practices and procedures governing academic action by the
University and the resolution of residents' grievances. Academic actions, which are defined to
include "[r]epeating a rotation," "[s]uspension," and "[n]on-renewal of contract," may not be
imposed absent "a pattern of [problematic] behavior," "flagrant or egregious behaviors," or
"actions that endanger patient safety." ECF No. 127-37 (GME Policy 12.1), at 2–3. If the
University decides to impose academic action, it must "notify the resident in writing of [the]
academic action to be imposed and the reasons for that action." *Id.* at 4. In cases of non-renewal
of contract, the policy generally requires the notice to be given "no later than four months prior to
the end of the resident's current contract." *Id.* at 5. And "[w]hen a resident is notified of . . . non-
advancement (including non-renewal of contract), the resident may request a hearing by the
Resident Review Committee." *Id.* at 7. As Dr. Pingree sees it, the University breached GME Policy
12.1 in two ways—it failed to provide her written notice of its decision not to offer her a PGY-2
position, much less written notice four months in advance, and when she requested a hearing with
the Resident Review Committee, she was told that she had no right to appeal to the Committee
under the terms of the policy.

GME Policy 11.4 describes the procedures that residency programs must follow to
compose final evaluation letters for their residents. Under this policy, "final evaluations must be
received by the Office of Graduate Medical Education within 30 days of the trainee's termination
or graduation." ECF No. 127-46 (GME Policy 11.4), at 2. It requires final evaluation letters for
successful residents to include the following language verbatim: "{Enter Trainee Name here} has
demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice in

15

{enter specialty}." *Id.* Dr. Pingree alleges that Dr. Milne did not complete her final evaluation until January 2020, months after her 2018–19 position was set to end in June 2019.

GME Policy 11.5 requires every accredited residency program to develop "a Standards of Performance and Evaluation policy . . . establish[ing] the criteria for promotion and/or renewal of a resident's/fellow's appointment" along with a "Supervision policy . . . establish[ing] program-specific supervision practices." ECF No. 144-2 (GME Policy 11.5). According to Dr. Pingree, the internal-medicine program did not have criteria for promotion and renewal, nor did it have an adequate supervision policy. Had it complied with the GME policy's requirements, she claims, she may have been offered a PGY-2 position.

Finally, University Policy 1-012 explains that the University "does not discriminate against individuals on the basis of . . . sex, . . . [or] gender," among other things. ECF No. 127-48 (University Policy 1-012), at 3. Dr. Pingree argues that the University breached this policy by discriminating against her on the basis of her gender and failing to provide her a meaningful process to raise her concerns about the allegedly discriminatory treatment.

As under the laws of many other States, the elements for breach of contract under Utah law are "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230–31 (Utah 2014). A failure to establish any of these elements dooms the claim.

The first three of Dr. Pingree's breach-of-contract claims—those based on the GME policies—essentially suffer from the same defect, precluding her from establishing breach (the third element). All three assume that Dr. Pingree was hired as a categorical resident when in fact she was hired as a one-year preliminary intern. Recall the distinction noted above between categorical residents and preliminary interns. Categorical residents are hired with the expectation

16

that if all goes well, they will complete their specified years of residency (three in the case of internal medicine) and then become eligible to practice medicine autonomously. This holds even though they enter their preliminary year on a one-year contract that disclaims any right of renewal for their PGY-2 year. Preliminary interns, on the other hand, are hired with the expectation that they will complete their one year as a preliminary intern and then go on to a categorical program in a different specialty (for example, radiology, dermatology, or anesthesia, all of which require a preliminary year). The preliminary year does not make the intern who completes it eligible to practice autonomously, and it is highly unusual if not unheard of for a successful preliminary intern to repeat the preliminary year. Thus, although categorical residents' contracts are typically renewed, it makes no sense to speak about renewing a preliminary intern's contract. Similarly, whereas residents who successfully complete a categorical program can expect an evaluation certifying them to practice autonomously, successfully preliminary interns cannot expect anything of the sort.

Consider again the language in the policies Dr. Pingree relies on. Concerning GME Policy 12.1, she claims she was subject to "academic action[]" in the form of "[n]on-renewal of contract." GME Policy 12.1, at 3. But as explained above, she could not have been subject to non-renewal of contract because as a preliminary intern, she had no expectation of contract renewal, regardless of how successful she was in the preliminary internship. Dr. Pingree insists that the policy itself does not distinguish between categorical residents and preliminary interns and that she was denied the opportunity to advance to PGY-2 that Dr. Milne had promised her. But offering Dr. Pingree a PGY-2 position would not have constituted a renewal of her preliminary-year contract because PGY-2 is not a preliminary year; it would have been an offer of an entirely different contract, one for residents in categorical programs. Dr. Pingree disputes this view of the distinction between

17

preliminary interns and categorical residents, but she points to no evidence to support her contention that preliminary interns can and do expect renewal of their contracts the way categorical residents do. And even if preliminary interns could sensibly be said to expect renewal of their contracts, Dr. Pingree's claim still fails for the simple reason that she did in fact obtain renewal of her contract—she was offered another preliminary internship, which she accepted.

As for GME Policy 11.4, Dr. Pingree claims that Dr. Milne failed to submit her "final evaluation[] . . . within 30 days of [her] termination or graduation." GME Policy 11.4, at 2. But Dr. Milne was not required to complete a final evaluation for Dr. Pingree under this policy because Dr. Pingree was a preliminary intern, not a categorical resident. The policy requires final evaluation letters to certify that successful residents are eligible to practice medicine autonomously, but preliminary interns are not eligible to practice autonomously based only on successful completion of the preliminary year, even if they are the most successful preliminary interns the world has ever seen. So, it makes no sense to apply the policy to preliminary interns like Dr. Pingree, and Dr. Milne was not subject to its requirements insofar as she was evaluating Dr. Pingree.

Regarding GME Policy 11.5, Dr. Pingree faults the internal-medicine program for not putting in place "criteria for promotion and/or renewal of a resident's/fellow's appointment" or a "[s]upervision policy," claiming that she might have been offered a PGY-2 position had the program had such policies in place. GME Policy 11.5. Setting aside the issue that her claim is purely speculative, her argument once again conflates preliminary interns with categorical residents, at least as to the requirement to have a promotion or renewal policy. As a preliminary intern, Dr. Pingree had no prospect of promotion or renewal; promotion and renewal apply to categorical residents. So, any failure on the part of the internal-medicine program to put promotion or renewal policies in place could not have harmed her.

18

University Policy 1-012 presents a somewhat different issue because it is a broad, university-wide policy, not one aimed only at categorical residents. Defendants argue that Dr. Pingree's breach-of-contract claim alleging discrimination in violation of this policy is barred by the Utah Antidiscrimination Act, and the court agrees. The Utah Antidiscrimination Act, UTAH CODE ANN. § 34A-5-101 et seq., prohibits discrimination on the basis of sex, among other things, and provides "the exclusive remedy under state law for employment discrimination based upon . . . sex," *id.* § 34A-5-107(15). Insofar as University Policy 1-012 "purport[s] to vest an employee with additional contractual rights against discrimination [on the basis of sex, it] would be contradictory to these statutory provisions—specifically the exclusivity mandate—and would necessarily be invalid." *Jones v. Huntsman Cancer Hosp.*, No. 2:12-cv-00814, 2013 WL 2145764, at *1 (D. Utah May 15, 2013) (cleaned up) (quoting *Code v. Utah Dep't of Health*, 174 P.3d 1134, 1137 (Utah App. 2007)). Dr. Pingree argues, however, that the right violated under this policy was not her right to be free from discrimination but rather her contractual right to a certain process (what she calls a broken promise). But this is a distinction without a difference. Any process provided by University Policy 1-012 is necessarily aimed at remedying prohibited discrimination, placing it squarely within the preemptive remedy provided by statute.

In sum, the first three of Dr. Pingree's contract claims fail because they incorrectly assume that Dr. Pingree was a categorical resident rather than a preliminary intern, and her final contract claim is barred by statute.

## II.    Count 2 (breach of the implied covenant of good faith and fair dealing, against the University)

Dr. Pingree's second claim is for breach of the implied covenant of good faith and fair dealing, also against the University. The University does not dispute that it had a valid employment

contract with Dr. Pingree, and every or nearly every contract governed by Utah law is subject to an implied covenant of good faith and fair dealing. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991). A party complies with the covenant when "[his] actions [are] consistent with the agreed common purpose and the justified expectations of the other party." *Id.* at 200. The agreed common purpose and justified expectations of the other party "[are] determined by considering the contract language and the course of dealings between and conduct of the parties." *Id.* (emphasis removed).

According to Dr. Pingree, the University through Dr. Milne injured her rights to receive the fruits of the University's policies by the same actions underlying the breach-of-contract claims; acted in bad faith toward her; and unfairly discriminated against her in deciding not to advance her to a PGY-2 categorical position. The court disagrees. As explained above, the University did not violate any of its policies in its interactions with Dr. Pingree—most of the procedures in the policies she cites did not apply to her because she was a preliminary intern, not a categorical resident. Without a viable claim for breach of contract, Dr. Pingree cannot maintain her claim for breach of the covenant of good faith and fair dealing.

## III.    Count 3 (promissory estoppel, against both the University and Dr. Milne)

Next is Dr. Pingree's claim of promissory estoppel against both the University and Dr. Milne in her personal capacity. In laymen's terms, promissory estoppel applies when one party has made a promise to the other and, under the circumstances, justice requires enforcement of the promise. *See Easton v. Wycoff*, 295 P.2d 332, 388 (Utah 1956). As Dr. Pingree sees it, Dr. Milne

20

promised her in February 2017 that if she worked as a preliminary intern for a year and did well, she would advance to a PGY-2 position; that promise then induced her to forgo other opportunities, including a categorical residency in Nevada and one in Arizona, and accept the one-year preliminary internship at the University. Had Dr. Milne not made the promise, Dr. Pingree argues, she would have gone elsewhere and finished with residency in 2020, or at least applied to positions out of state for the 2018–19 academic year while working as a preliminary intern.

To prove her claim of promissory estoppel, Dr. Pingree must prove that

> (1) [she] acted with prudence and in reasonable reliance on a promise made by [Dr. Milne]; (2) [Dr. Milne] knew that [Dr. Pingree] had relied on the promise[,] which [Dr. Milne] should reasonably expect to induce action or forbearance on the part of [Dr. Pingree] or a third person; (3) [Dr. Milne] was aware of all material facts; and (4) [Dr. Pingree] relied on the promise and the reliance resulted in a loss to [her].

*Youngblood v. Auto-Owners Ins. Co.*, 158 P.3d 1088, 1092 (Utah 2007) (internal quotation marks omitted).

Defendants offer various procedural bases to find in their favor on this claim, including the parol-evidence rule and the statute of frauds. The parol-evidence rule "operates . . . to exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an integrated contract." *Tangren Fam. Tr. v. Tangren*, 182 P.3d 326, 330 (Utah 2008) (emphasis removed). As Defendants see it, the University's contract with Dr. Pingree for her preliminary internship was a written integrated contract that provided no opportunity for renewal, and any oral promise by Dr. Milne to the contrary cannot be used to vary the clear terms of the written contract. The problem with this view is that Dr. Pingree is not invoking the oral promise to alter the terms of this written contract; rather, the oral promise concerned the possibility of entering into an entirely separate contract—one for a PGY-2 position based on her preliminary-year performance. The distinction between preliminary interns and

21

categorical residents explained above worked against Dr. Pingree on her contract claims, but it works in her favor here. The parol-evidence rule is therefore no bar.

The statute of frauds in Utah provides that "every agreement that by its terms is not to be performed within one year from the making of the agreement" is "void unless the agreement . . . is in writing[ and] signed by the party to be charged with the agreement." UTAH CODE ANN. § 25-5-4(1). This provision "applies only to contracts that are literally *incapable* of being performed within one year." *Pasquin v. Pasquin*, 988 P.2d 1, 6 (Utah 1999). Nothing about Dr. Milne's oral promise in February 2017 to offer Dr. Pingree a PGY-2 position if she did well made it impossible to be performed within a year. Dr. Milne could have theoretically made the PGY-2 offer, say, in December 2017 after Dr. Pingree had had a few months of her preliminary internship under her belt.[4] So, the statute of frauds is also no bar.

On the merits, Defendants argue that any reliance by Dr. Pingree on the oral promise was unreasonable, primarily because a written contract already controlled. *See Wardley Corp. v. Meredith Corp.*, 93 F. App'x 183, 186 (10th Cir. 2004) ("[W]hen the alleged promises made are contrary to the terms of the contract, reliance on such promises would be unreasonable."). The court disagrees. As noted above, the oral promise concerned not the preliminary-internship contract then in force but rather the possibility of obtaining a separate contract entirely. And the context of the conversation between Dr. Pingree and Dr. Milne could support Dr. Pingree's position that reliance was reasonable. During the February 2017 meeting between Dr. Pingree and Dr. Milne, Dr. Milne explained that she would not be matched to the internal-medicine categorical

---

[4] Indeed, Dr. Pingree claims that the decision not to offer her a PGY-2 position was made at a December 2017 meeting of the Clinical Competency Committee.

program but encouraged her to apply for a preliminary internship instead. She said that whereas she previously did not believe in Dr. Pingree, she did now. Shortly after saying that, Dr. Milne said, "[I]f everything goes well next year we would just, at this point in the year, . . . offer you a PGY 2 spot in the categorical position." And she reiterated, "[I]f you do well next year, I guarantee you can stay in this program." *Id.* at 3. In short, Dr. Milne expressed her faith in Dr. Pingree before making her promise, not just once but twice, supporting a finding of reasonable reliance.

Next, Defendants argue that Dr. Pingree failed to meet the condition precedent—namely, that she "do well." But the record evidence is mixed on this point. Sure, some of Dr. Pingree's supervisors were not impressed by her. Others, though, had very positive feedback about aspects of her performance. And given the direct of evidence of discrimination discussed below, a reasonable jury could find that Dr. Pingree had in fact done a satisfactory job as a preliminary intern but was still not given a PGY-2 position because of other (inappropriate or unlawful) considerations.

IV.    **Count 4 (deprivation of liberty and property interest in violation of the Due Process Clause of the Fourteenth Amendment, against both the University and Dr. Milne)**

Dr. Pingree's next two claims arise under the Fourteenth Amendment, and since Defendants are state actors, she must turn to 42 U.S.C. § 1983 for her cause of action. Under § 1983, a plaintiff may sue "every *person* who, under color of [state law], subjects [her] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). In her opposition brief, Dr. Pingree concedes that the University is not a "person" as § 1983 uses the term. She also concedes that she has no claim for violation of a liberty interest. Thus, her claim under the Due Process Clause of the Fourteenth Amendment reduces to a

23

claim against Dr. Milne in her personal capacity for violations of her property interests.[5] According to Dr. Pingree, Dr. Milne violated her due-process rights by denying her the opportunity to continue her employment and training at the University.

Dr. Milne has invoked qualified immunity from suit, so for Dr. Pingree to succeed on her Due Process Clause claim, she must show that Dr. Milne's actions violated her constitutional rights and that those rights were clearly established at the time of the violation. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The Due Process Clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV § 1. For Dr. Milne to have violated Dr. Pingree's due-process rights, either procedural or substantive, Dr. Pingree must have had a protected property interest that Dr. Milne's actions infringed. A public employee may have a property interest in his continued employment if he "ha[s] a legitimate claim of entitlement to it" based on the terms of his appointment. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). According to Dr. Pingree, she had a property interest in her continued employment and training at the University. *Hyde Park Co. v. Santa Fe City Council*, 226 F. 3d 1207, 1210 (10th Cir. 2000). But as explained above, Dr. Pingree's preliminary internship was at all times a one-year job with no option of renewal. Although she continues to assert that she was subjected to non-renewal of contract, no such action occurred because her

---

[5] Dr. Pingree insists that her claim against Dr. Milne in her official capacity can proceed. The court disagrees. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). That means that her claim against Dr. Milne in her official capacity is really just a claim against the University, which as Dr. Pingree concedes is not a suable person for § 1983 purposes. Although Dr. Pingree correctly observes that she could bring a claim against Dr. Milne in her official capacity for injunctive relief, *see Roach v. Univ. of Utah*, 968 F. Supp. 1446, 1451 (D. Utah 1997), Dr. Pingree does not seek injunctive relief in this action anymore, so this argument is moot.

contract was not the kind of contract that provided for renewal. "The terms of [her] appointment secured absolutely no interest in re-employment for the next year," so "[s]he did not have a property interest sufficient to [trigger the protections of the Due Process Clause]" regarding the University's decision not to hire her as a PGY-2 after her preliminary year. *Roth*, 408 U.S. at 578. (Or, viewed differently, she was not subjected to non-renewal of contract because her contract was in fact renewed for an additional year.)

## V.    Count 5 (violation of the right to equal protection under the Equal Protection Clause of the Fourteenth Amendment, against both the University and Dr. Milne)

Like Dr. Pingree's fourth claim, her claim for violation of the right to equal protection relies on § 1983 and therefore reduces to a claim against Dr. Milne in her personal capacity. And once again, Dr. Milne invokes qualified immunity, which means that Dr. Pingree must show a violation of a clearly established constitutional right to succeed.

The Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV § 1. It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Before proceeding, it is worth noting that discrimination based on family or single-parent status does not trigger heightened scrutiny under the Equal Protection Clause unless that discrimination is in substance discrimination on the basis of sex. That is because neither the Supreme Court nor the Tenth Circuit has ever recognized familial status or single-parent status as suspect classifications. So, a government agency can take a candidate's status as a single parent into account when evaluating his candidacy for a position as long as it can articulate a rational basis for doing so. *City of Cleburne*, 473 U.S. at 440. In the context of this case, that means that the Equal Protection Clause allowed the University to consider Dr. Pingree's

25

status as a single parent in evaluating her candidacy, unless of course doing so was cover for discriminating against her on the basis of sex.

In any event, a plaintiff may bring an equal-protection case alleging discrimination based on membership in a protected class (the traditional theory), or he may allege that he was singled out and discriminated against irrationally (the class-of-one theory). Here, Dr. Pingree's equal-protection claim centers on the University's decision not to accept her for a categorical-residency position for the 2017–18 school year and its decision not to offer her a PGY-2 position for the 2018–19 school year. Dr. Milne was involved in making both of these decisions. According to Dr. Pingree, the University considered her marital status and childcare duties in evaluating her application because she was a female. In other words, she alleges that she was discriminated against for being a divorced single mother. Although Dr. Pingree does not clarify which equal-protection theory animates her arguments and Defendants brief both theories, the court considers only the traditional theory because "the class-of-one theory . . . has no application in the public employment context." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008).

To succeed on a traditional theory of class-wide discrimination, a plaintiff must proceed under the familiar *McDonnell-Douglas* burden-shifting framework originally used in the Title VII context absent direct evidence of discrimination. *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991). Under that framework, the plaintiff must first establish a prima facie case by "showing that (1) [she] belongs to some protected class, (2) [she] was qualified for the position or benefit at issue, (3) [she] suffered an adverse employment action, and (4) [she] was treated less favorably than others." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). If the plaintiff establishes her prima facie case, then "the burden shifts to the defendant to produce some nondiscriminatory reason for its behavior." *Id.* at 1134–35. If the defendant does so, as the

26

defendant almost always does, then "the plaintiff must show that the reasons proffered by the defendant are pretextual," such as by "revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action." *Id.* at 1135 (internal quotation marks omitted). This framework gives the plaintiff a chance to get her day in court with only circumstantial evidence.

But if the plaintiff can point to direct evidence of discrimination, then she need not proceed under *McDonnell Douglas* at all. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Direct evidence can include "[c]omments in the workplace that reflect personal bias" if the speaker "had decisionmaking authority and acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). Put differently, "[d]irect evidence includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007).

Dr. Pingree argues that she can point to direct evidence of discrimination in the form of discriminatory comments made by Dr. Milne during the conversation they had in March 2018 in which Dr. Milne explained that the University did not have a PGY-2 spot for her. Recall that during this conversation, Dr. Milne, who was closely involved with the University's evaluation of Dr. Pingree, raised the issue of Dr. Pingree's home situation and its relationship to Dr. Pingree's alleged inconsistent performance in her preliminary internship. The court agrees that at least some of Dr. Milne's comments during this conversation could be understood to indicate a discriminatory, stereotype-based bias against Dr. Pingree as a single mother. For example, Dr. Milne asked Dr. Pingree at one point what she would do "to be reliable and dependable in the workplace" if she were given a PGY-2 position, explaining that everyone, including herself, must be professional at

27

work. ECF No. 107-3, at 14. Dr. Milne explained the division of responsibility in her own home
with her husband, saying, "I don't want it to be a woman/male thing, it could be either, right? But
it does fall to the woman. . . . It wasn't—it just—it just fell—so I wish it weren't a man/woman
thing but it is." *Id.* at 14–15. This statement could be found to imply that Dr. Pingree as a woman
would necessarily bear more of the domestic responsibilities and struggle more than a similarly
situated man to meet the standards of the workplace. Such a conclusion would be bolstered by Dr.
Milne's subsequent statement explaining that "[she was] actually writing a paper about women
having children in residency [finding that] 67 percent of women in procedural specialties after they
have a child wish they had chosen a different specialty." *Id.* at 15–16. In short, Dr. Milne's
statements during the conversation in which she told Dr. Pingree about the decision not to offer
her a PGY-2 position directly support a finding that considerations of gender, particularly
stereotypes about gender roles, inflected the University's assessment of Dr. Pingree's candidacy.

This direct evidence of discrimination means that Dr. Pingree bypasses *McDonnell
Douglas* entirely. That said, it is possible that a jury could find that the University's decisions were
driven not by discrimination but by Dr. Pingree's own lackluster application and performance
issues. After all, her board-exam scores were not particularly competitive, and she had received
inconsistent evaluations of her performance during her preliminary year. For example, on several
occasions she arrived late to her shifts without notifying her supervisors ahead of time that she was
running late. Her discharge summaries were sometimes late and not detailed enough, and she
occasionally made copy-paste errors. In addition to these issues, she had over the years
demonstrated a tendency to break down emotionally in stressful situations, beginning with her
interview with Dr. Milne in 2012. As a PGY-2, Dr. Pingree would have exercised supervisory
authority over interns, including in emotionally stressful environments like the ICU, and the

University could have reasonably determined that based on the reports about her from her preliminary year, she was not a suitable candidate for the role. Perhaps this is the more persuasive reading of the facts. But the presence of direct evidence means that a jury could still find that considerations of sex motivated Dr. Milne's decision.

This conclusion alone, though, does not mean that Dr. Pingree has successfully defeated Defendants' motion for summary judgment; she must still overcome the second prong of the qualified-immunity analysis by showing that the right allegedly violated was clearly established at the time of the alleged violation. *Riggins*, 572 F.3d at 1107. Fortunately for her, that burden here is relatively light because the "Supreme Court ha[s] found in multiple decisions that the Fourteenth Amendment's Equal Protection Clause guarantees female employees the right to be free from arbitrary sex discrimination in the workplace." *Yerkes v. Ohio State Highway Patrol*, 455 F. Supp. 3d 523, 539 (S.D. Ohio 2020); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the [sex] stereotype associated with their group."). Accordingly, a jury should decide the issue, and neither side is entitled to summary judgment on Dr. Pingree's claim of sex-based discrimination.

## VI.    Count 6 (intentional interference with business relations, against both the University and Dr. Milne)

This claim is also brought against both the University and Dr. Milne.[6] Defendants argue that the claim fails because of the Utah Governmental Immunity Act, and the court agrees for

---

[6] Defendants did not originally move for summary judgment on this claim insofar as it was brought against the University. At oral argument, however, counsel for Defendants clarified that this decision was the result of a simple oversight. Ordinarily, the court would have allowed the claim

largely the same reasons explained in its earlier order granting Defendants' motion to dismiss counts 9 and 10 of Dr. Pingree's complaint. ECF No. 37; *Pingree v. Univ. of Utah*, No. 2:20-cv-00724, 2022 WL 1307902 (D. Utah May 2, 2022).

In brief, the Utah Governmental Immunity Act provides that "each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function." UTAH CODE ANN. § 63G-7-201(1). This immunity attaches when "the activity undertaken [wa]s a governmental function" unless "governmental immunity was waived for the particular activity" and "there is an exception to that waiver." *Peck v. State*, 191 P.3d 4, 7 (Utah 2008).

All of Dr. Milne's conduct at issue for this claim was undertaken in her capacity as an employee of the University for University purposes. The University is a governmental entity and therefore presumptively immune; likewise, Dr. Milne as a University employee is presumptively immune. And "[t]here are no provisions in the Act waiving immunity for intentional torts" like intentional interference with business relations. *Miller v. Utah*, 638 F. App'x 707, 715 (10th Cir. 2016).

## VII.    Count 7 (sex discrimination and retaliation under Title IX, against both the University and Dr. Milne)

We next turn to Dr. Pingree's federal statutory claims under Title IX and Title VII. Both sets of claims contain the following two theories: sex discrimination and retaliation. And her sex-discrimination theories focus on the same three actions by the University, the latter two of which

---

to proceed against the University, but since the immunity issue is relatively straightforward and is equally applicable to both defendants, the court disposes of it here.

will be familiar from the Equal Protection Clause discussion above: failing to hire her for a categorical residency in radiology starting fall 2017, failing to hire her for a categorical residency in internal medicine starting fall 2017, and failing to hire her for a PGY-2 position after her preliminary year. As noted above, Dr. Milne was involved in both of the latter two decisions. She was not, however, involved in the former.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a). Although the text of Title IX does not include an express prohibition on retaliation for complaining about sex discrimination, the Supreme Court has read the statute to prohibit such retaliation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) ("[R]etaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.").

Claims of sex discrimination under Title IX are assessed under the same *McDonnell Douglas* burden-shifting framework used to assess claims of sex discrimination under Title VII (and, by extension, the Equal Protection Clause). *Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1176 (10th Cir. 2001). As explained previously, Dr. Pingree can point to direct evidence of discrimination for the two decisions involving Dr. Milne, so she may bypass the burden-shifting altogether and proceed directly to a jury regarding those. But her claim of sex discrimination in the decision not to hire her for a radiology residency starting fall 2017 is not supported by direct evidence, requiring a *McDonnell Douglas* analysis. In this analysis, Dr. Pingree cannot make out her prima facie case because she cannot show that she was treated less favorably than others applying for a radiology residency.

31

Dr. Pingree cannot point to a single male parent with her credentials and background who was offered a residency in radiology in the same Match cycle. The lack of such evidence, though, is entirely understandable given her unique circumstances. Nevertheless, she cannot produce any evidence that the decision-makers treated her differently because she was a woman. Dr. Marta Heilbrun was the program director of the diagnostic-radiology residency at the time that Dr. Pingree applied through the Match. She testified that "the strongest applicants have letters of support from radiology," "have participated in radiology projects," and "ha[ve] advocates within the radiology community." ECF No. 121-5, at 16. Although Dr. Pingree's application had many positive aspects, it lacked a letter of support from radiology and indicated that she had not engaged in projects with radiology even though she had participated in a joint radiology-cardiology imaging fellowship. Plus, "people in radiology did not have a sense of who she was[,] and she had not built relationships with people in radiology," suggesting she had often been absent. *Id.* at 18–19. These features "certainly did not make her a strong candidate." *Id.* at 19. Dr. Pingree cannot even show that any other candidate, let alone a single male parent, was offered a position in radiology despite similar red flags, dooming her prima facie case as to Defendants' failure to hire her for a radiology residency. That means that of her Title IX discrimination theories, only the ones involving Dr. Milne may proceed to a jury.

Dr. Pingree also claims that Defendants retaliated against her for reporting what she perceived as sex discrimination by interfering with and ultimately sabotaging her application for the PGY-2 position at Greenwich Hospital in Connecticut. Specifically, she argues that Dr. Milne's choice to copy the University's attorney on her email to Dr. Seelig, the program director of the internal-medicine program at Greenwich, combined with her repeated delays in sending a

recommendation letter contributed to Greenwich's decision not to offer Dr. Pingree a PGY-2 position.

In the court's view, this claim survives Defendants' motion for summary judgment. To prove a case of retaliation without direct evidence, a plaintiff must first establish a prima facie case using the *McDonnell Douglas* framework by showing that (1) he engaged in protected opposition to discrimination, (2) he suffered an adverse action, and (3) a causal connection exists between the two. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001) (Title VII standard); *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("Title VII and Title IX are governed by the same substantive standards for reviewing claims of . . . retaliation."). The parties agree, at least for present purposes, that Dr. Pingree engaged in protected activity (prong 1) when she lodged two complaints with the University about its decision not to offer her a PGY-2 position for the 2018–19 school year and that Dr. Milne learned of the protected activity no later than November 7, 2018. The parties' dispute thus centers on the second and third prongs. For an action to qualify as adverse for the second prong, it must be such that "a reasonable employee . . . might be dissuaded from making a charge of discrimination." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008). So, "an action that significantly harms a plaintiff's future employment prospects may be considered an adverse action." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004). And causation means that the defendant "was motivated to commit the challenged conduct by a desire to retaliate against [the] protected activity." *Semsroth v. City of Wichita*, 548 F. Supp. 2d 1203, 1211 (D. Kan. 2008). Specifically, the protected activity must have been a but-for cause of the subsequent adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Consider again the factual context of Dr. Pingree's retaliation claims. In November 2018, Dr. Crosby, who was advising Dr. Pingree, emailed Dr. Seelig about an open PGY-2 position. Dr.

Seelig said that he needed Dr. Pingree's application materials prior to a selection-committee meeting on November 20. Dr. Milne as a program director herself knew that Dr. Seelig would need a letter of recommendation from her as part of Dr. Pingree's application packet, but Dr. Milne did not feel comfortable writing the letter arguably because of the pending discrimination claim and therefore asked Dr. Crosby to do so on November 14, attaching a copy of a recommendation letter she'd written for Dr. Pingree just a few months earlier. ECF No. 144-7, at 1 ("I think [Dr. Pingree] is concerned about me taking the calls. So maybe best you write [the letter]."). Dr. Crosby sent his letter to Dr. Seelig the next day (without needing to ask Dr. Pingree for her permission first, it should be noted). A little over a month later, on December 20, Dr. Seelig emailed Dr. Crosby to say that Greenwich was seriously considering Dr. Pingree for the PGY-2 position and that he needed a letter of recommendation from Dr. Milne.

Dr. Crosby contacted Dr. Milne about this request the same day, but Dr. Milne explained that she would not draft a letter until Dr. Pingree reached out to her. On December 26, about a week later, Dr. Pingree asked Dr. Milne for a recommendation letter. Dr. Milne initially hesitated and emailed Dr. Seelig to set up a phone call instead. On this email, she copied the University's attorney, Mr. Smith. She claims she did so accidentally, but nevertheless it raised a red flag for Dr. Seelig.

Dr. Milne spoke with Dr. Seelig over the phone on December 31, and the next day she conveyed to Dr. Crosby that Dr. Seelig was suspicious of Dr. Pingree's application because it was missing a recommendation letter from Dr. Milne. On January 2, Amy Kern, an administrative associate director, sent two recommendation letters to Dr. Seelig on behalf of Dr. Milne, one dated May 2018 and one dated January 2019. Shortly after that, on January 4, Dr. Seelig informed Dr. Pingree that she had not been selected for the PGY-2 position. In a January 14 email to Mr. Smith,

34

Dr. Milne recognized that the delay in Dr. Seelig's receiving her recommendation letter was at least a major if not the main cause of Dr. Pingree's not getting the PGY-2 position at Greenwich because, as any program director would know, not having a recommendation letter from the program director is "a very big red flag." ECF No. 144-12, at 3. Notably, though, Dr. Milne maintained it was Dr. Pingree's fault because she did not request a recommendation letter from Dr. Milne or send Dr. Seelig Dr. Milne's contact information on time.

Dr. Milne's decision to copy the University's attorney on her email to Dr. Seelig and her delay in sending the recommendation by her own admission (at least as to the latter) harmed Dr. Pingree's prospects at Greenwich Hospital and therefore count as adverse actions. And a reasonable jury could find from this evidence that Dr. Pingree's complaints of sex discrimination caused Dr. Milne to make these choices because Dr. Milne's actions followed closely on the heels of her learning about Dr. Pingree's complaint about sex discrimination. "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). And "the closer [the adverse action] occurred to the protected activity, the more likely it will support a showing of causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Dr. Milne found out about the complaint on November 7, 2018, and her challenged actions took place the next month. The timing here is sufficient on its own to establish causation for the prima facie case. *See Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (holding that a period of one and a half months between the protected activity and adverse action can by itself establish causation), *overruled on other grounds*, *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186 (10th Cir. 1998).

Dr. Pingree's prima facie case established, the burden then shifts to Defendants to articulate a legitimate, nonretaliatory reason for the adverse action. Defendants do not attempt to do so in

35

their briefing, but considering that this burden is "exceedingly light," *Montes v. Vail Clinic, Inc.*,
497 F.3d 1160, 1173 (10th Cir. 2007), the court considers the nonretaliatory reasons contained in
the record anyway for completeness. According to her January 14 email to Mr. Smith, Dr. Milne's
decision to copy Mr. Smith on an email to Dr. Seelig "was totally a mistake." ECF No. 144-12, at
3. She explained, "It was meant to be a BC but unfortunately I was doing this on my phone on
vacation in South America . . . ." *Id.* As for the late-submitted letters, Dr. Milne identified Dr.
Pingree's own delay as the real cause: "Rita failed to ask me for a letter in a timely manner." *Id.*

The burden then shifts back to Dr. Pingree to show that the stated nonretaliatory reasons
were pretextual, meaning that she must show those reasons "are so incoherent, weak, inconsistent,
or contradictory that a rational factfinder could conclude they are unworthy of belief." *Bird v. W.
Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016) (internal quotation marks omitted) (alteration
omitted). Here, Dr. Milne's stated reasons contain a glaring weakness: She blames Dr. Pingree for
failing to ask her for a recommendation letter in a timely manner when she was well aware weeks
earlier that Dr. Pingree would need a letter from her and it does not appear that she actually needed
Dr. Pingree's permission to send the letter.

As a program director herself, Dr. Milne knew that Dr. Seelig would eventually need a
recommendation letter from her as part of Dr. Pingree's application materials. In a November 14
email, she passed the responsibility of writing the letter off to Dr. Crosby. Dr. Crosby submitted
his recommendation letter to Dr. Seelig along with Dr. Pingree's other application materials on
November 15—without asking for Dr. Pingree's permission beforehand. On December 20, Dr.
Seelig wrote back saying that he needed a letter from the program director as well. He said that he
"informed Rita of this" and that "she said she would be in touch with [Dr. Milne]." ECF No. 127-
50, at 5. Ms. Kern notified Dr. Milne the same day in a high-importance email that Dr. Seelig

36

wanted a letter of recommendation from her. Dr. Milne, however, did nothing until Dr. Pingree reached out to her on December 26. Even then, Dr. Milne did not write a letter of recommendation. Instead, she waited until January 2—after Dr. Seelig had expressed he was suspicious about why Dr. Pingree did not have a letter from her—and then had Ms. Kern send out her letters. In addition, Dr. Milne told Dr. Pingree that her leave of absence made it a tricky situation for her to communicate with Dr. Seelig, but as Dr. Pingree pointed out, her leave was irrelevant to the recommendation letter. Indeed, Dr. Pingree had not even taken her leave of absence until December 20—well after Dr. Seelig had initially requested a letter of recommendation the previous month.

Based on these facts, a reasonable jury could disbelieve Dr. Milne's explanations for her actions. The jury could find that Dr. Milne intentionally copied Mr. Smith on her email to subtly indicate to him that Dr. Pingree was in her view a problematic candidate, and the jury could find that Dr. Pingree's filing of her discrimination claims was the cause of Dr. Milne's hesitancy to send the letter. Moreover, Dr. Milne's subsequent statements deflecting blame onto Dr. Pingree could be seen as a disingenuous post-hoc rationalization for her choice not to write a timely recommendation letter because she knew from the beginning of Dr. Pingree's application process to Greenwich that she would eventually need to do so. Even accepting Dr. Milne's characterization of her actions, a jury could still find that on a very basic level, Dr. Pingree's complaint caused the delay in getting Dr. Milne's recommendation letter to Dr. Seelig. After all, Dr. Milne asked Dr. Crosby to write a letter instead because she was uncomfortable about the prospect of advocating for Dr. Pingree when Dr. Pingree had filed a complaint about her. And although Dr. Milne said that the leave of absence was making it tricky for her to write a recommendation letter, Dr. Pingree did not take her leave until well after Dr. Seelig initially requested a recommendation letter— suggesting that Dr. Pingree's complaint was the real reason Dr. Milne waited until the last minute

to write her letter. Were it not for the complaint, Dr. Milne likely would not have shifted the writing responsibilities onto Dr. Crosby early on, and Dr. Seelig at Greenwich would have timely received her recommendation letter in November.

It is possible that Dr. Milne was simply feeling uncomfortable given her difficult conversations with Dr. Pingree and tried to chart a course that would give Dr. Pingree the best possible shot at getting the Greenwich PGY-2 position, accidentally copying Mr. Smith on an email to Dr. Seelig. *See* ECF No. 144-12, at 3 ("I would have NO reason for Rita not to get the position at Greenwich Hospital. It would have been in my best interest for her to have received that position."). In this interpretation of the facts, Dr. Pingree is at least equally to blame for the adverse action. Perhaps this is the more convincing explanation, but that is for a jury to decide. A claim of retaliation requires only an adverse action caused by the plaintiff's complaint, and the court concludes that Dr. Pingree can support her theory with sufficient evidence to warrant a jury trial on this claim.

## VIII.  Count 8 (sex discrimination and retaliation under Title VII, against both the University and Dr. Milne)

Title VII makes it "unlawful . . . for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Title VII thus extends protections from sex discrimination similar to those under Title IX to university employees like Dr. Pingree. Unsurprisingly then, Dr. Pingree's Title VII claims essentially duplicate her Title IX claims, and the court's conclusions from the Title IX discussion above apply equally here, with one twist. Title VII contains an administrative-exhaustion requirement, meaning that a Title VII discrimination

38

plaintiff must timely file a charge of discrimination with the Equal Employment Opportunity Commission to preserve the claim for federal-court review. *See id.* § 2000e-5(e). Here, the parties agree that Dr. Pingree was required to file her charge of discrimination with the Commission within 300 days of experiencing the alleged discriminatory employment event. Dr. Pingree filed her charge with the Commission on March 12, 2019, so any discriminatory employment events before May 16, 2018 (300 days prior to her filing the charge) are no longer actionable. In her amended complaint, Dr. Pingree concedes that she learned that she would not be offered a PGY-2 position for the 2018–19 academic year during her March 2018 meeting with Dr. Milne. ECF No. 24-1 ¶ 112. That meeting took place on March 12, 2018—four days outside the 300-day window. And the other actions Dr. Pingree challenges (the failure to match into the radiology or internal-medicine categorical programs) took place even earlier. So, Dr. Pingree's Title VII discrimination claim must be dismissed for failure to timely exhaust administrative remedies. Her Title VII retaliation claim, however, may proceed to a jury for the same reasons her Title IX retaliation claim may (this claim is not barred by an administrative-exhaustion issue).

*    *    *

For the reasons explained above, Defendants are entitled to summary judgment on all of Dr. Pingree's claims except her claims of promissory estoppel, violation of equal protection, discrimination, and retaliation. Those issues are for the jury.

## IX.    Dr. Pingree's Motion for Partial Summary Judgment

The court's conclusion above moots Dr. Pingree's motion for summary judgment on her sex-discrimination claims.

One last issue requires a brief discussion. In her motion for partial summary judgment, Dr. Pingree also asks the court to preclude Defendants from raising a defense of failure to mitigate

39

damages. Dr. Pingree's brief was filed before the court issued its order denying Dr. Pingree's separate motion for sanctions on February 20, 2025. ECF No. 139. The February 20 order essentially resolves the issue in Dr. Pingree's motion for partial summary judgment, and the court declines to disturb its earlier ruling: Dr. Pingree cannot show that Defendants intentionally or negligently failed to preserve the emails that she claims would have shown her efforts to mitigate her damages, so Defendants are not precluded from raising a defense of failure to mitigate damages. But if Defendants do intend to raise this defense at trial, the court orders them to give Dr. Pingree at least one hour to depose a University witness knowledgeable about the email system, and Dr. Pingree is entitled to testify to her view of the facts before the jury.

## CONCLUSION AND ORDER

The court **GRANTS** Defendants' motion for summary judgment on the following counts:

- Count 1 (breach of contract);

- Count 2 (breach of covenant of good faith and fair dealing);

- Count 4 (violation of the right to due process);

- Count 5 (violation of the right to equal protection), insofar as it is brought against the University or Dr. Milne in her official capacity;

- Count 6 (intentional interference with business relations); and

- Count 8 (sex discrimination and retaliation in violation of Title VII), insofar as it alleges sex discrimination.

The court **DENIES** Defendants' motion for summary judgment as to the following counts:

- Count 3 (promissory estoppel);

- Count 5 (violation of the right to equal protection), insofar as it is brought against Dr. Milne in her personal capacity;

- Count 7 (sex discrimination and retaliation in violation of Title IX); and

- Count 8 (sex discrimination and retaliation in violation of Title VII), insofar as it alleges retaliation.

The court also **DENIES** Dr. Pingree's motion for partial summary judgment.

Signed August 15, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

41